CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 31 2018

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DELANO DONTAE FITZ, | ) | CASE NO. 7:18CV00033 |
| | ) | |
| Petitioner, | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| WARDEN, NOTTOWAY | ) | By: Hon. Glen E. Conrad |
| CORR. CTR., | ) | Senior United States District Judge |
| Respondent. | ) | |

Delano Dontae Fitz, a Virginia inmate proceeding pro se, filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the validity of his convictions. Respondent filed a motion to dismiss, and Fitz responded, making the matter ripe for disposition. After review of the record, the court concludes that the petition must be dismissed.

I. Background[1]

The Court of Appeals of Virginia summarized the evidence of Fitz's convictions as follows:

> On December 24, 2013, Traman Turner arrived at Edasha Williams' house to pick up his children. Williams, the mother of the children, was involved in a romantic relationship with Fitz at the time and Fitz was also at the residence. Williams explained that Fitz went outside while she was getting the children ready. She saw Fitz and Turner speaking to each other and heard Turner say: "when you come bring your big toys." Fitz then produced a gun and shot Turner. Fitz threatened Williams with the gun and shot Turner three more times in the back as Turner tried to escape. Fitz then fled the scene. Turner died as a result of the gunshot wounds. Williams indicated that Turner was not armed and that she did not hear him threaten Fitz or make any aggressive movements.
>
> Two neighbors saw the shooting and testified that Fitz shot the victim at close range – first in the chest and then in the back. Another neighbor saw the two men outside and heard Fitz accuse Turner of having "disrespected" him. She also heard the victim make a statement about "big toys" and that there would be "70 rounds next time." She went inside and moments later she heard gunfire.
>
> Dontray Haughton, Fitz's friend, testified that Fitz arrived at his residence and asked Haughton to retrieve his gun for him. Haughton explained that Fitz

---

[1] This opinion omits internal quotation marks, citations, and alterations unless otherwise noted.

appeared shaken. Haughton retrieved the gun from a trashcan and returned it to Fitz. Fitz told Haughton that he shot the victim "for no reason."

Jamie Chacon testified that he visited his nephew, one of Williams' children, in December 2013. Fitz was at the residence, showed Chacon his gun, made gang signs, and stated his intention to kill Turner.

Stacy Taylor shared a jail cell with Fitz. Fitz admitted to Taylor that he killed Turner and offered Taylor drugs if Taylor would kill Williams and threaten one of the other witnesses. Several other men who had been jailed with Fitz testified Fitz admitted killing Turner, had previously stated his intention to kill Turner, and planned to have the witnesses against him killed or threatened.

Fitz v. Commonwealth, No. 0770-15-3, slip op. at 4-5 (Va. Ct. App. Dec. 4, 2015), ECF No. 17-2.

The circuit court initially appointed Aaron Graves as Fitz's counsel but later disqualified him for a conflict of interest. The court then appointed Louis Nagy and granted Nagy's motion for a continuance. Nagy asked for two more continuances, citing voluminous evidence and the Commonwealth's failure to disclose exculpatory witness statements. The trial court granted the motions and found that Fitz had waived his speedy trial rights each time.

A jury convicted Fitz of second-degree murder and use of a firearm in commission of murder, and he pleaded guilty to possession of a firearm after a conviction of a non-violent felony. The Rockingham County Circuit Court sentenced Fitz to forty-eight years in prison. After the trial, the trial court denied Fitz's motion to set aside the verdict, and the Court of Appeals and the Supreme Court of Virginia denied his direct appeals. Fitz did not file a state habeas petition. The respondent acknowledges that Fitz's petition is timely.

## II.

Fitz brings six claims:[2]

I. The trial court erred when it denied Fitz's motion to strike two jurors for cause;

---

[2] Fitz numbered some claims and interspersed others throughout his filings. See ECF Nos. 1, 2, 7. The court has reorganized and renumbered his claims in an attempt to fully address his arguments.

II. The trial court abused its discretion when it removed Fitz's counsel of choice, Aaron Graves, and replaced him with Louis Nagy;

III. The trial court erred in finding the evidence sufficient for both second-degree murder and use of a firearm in murder;

IV. The trial court erred in giving an incomplete definition of malice, which did not include the required explanation of heat of passion;

V. Counsel was ineffective for:

A. failing to call requested witnesses;

B. failing to prepare jury instructions in advance of trial as required under Virginia rules;

C. failing to adequately investigate, provide adversarial representation, and challenge the Commonwealth's withholding of Brady[3] material and use of knowingly false statements, testimonies, and evidence, and for requesting continuances that waived Fitz's speedy trial rights;

D. laboring under divided loyalties that prevented counsel from providing zealous representation;

E. failing to press for discovery;

F. failing to challenge Investigator Spiggle's testimony that Fitz told him that the victim had disrespected him;

G. failing to investigate the victim's background, interview witnesses, and pay travel expenses for potential defense witness Aaron Strode to testify on Fitz's behalf at trial;

---

[3] Brady v. Maryland, 373 U.S. 83 (1963).

3

H. refusing to move to dismiss as vindictive five additional charges brought by the Commonwealth;

I. refusing to suppress fraudulent use of jailhouse information and state witnesses providing false testimony in exchange for favor from the state;

J. conceding his motion to compel <u>Brady</u> information from the state regarding the victim's criminal background and gang affiliation;

K. failing to object to the jury instruction defining malice on the ground that it did not adequately define "heat of passion"; and

VI. Fitz's due process rights were violated because:

A. the Commonwealth failed to timely disclose <u>Brady</u> material which caused delay and deprived him of his right to a speedy trial, and the trial court failed to hold the Commonwealth responsible for its late disclosure;

B. the Commonwealth forced Fitz to choose between his right to a speedy trial and his right to effective counsel;

C. the trial court was biased against Fitz and erred when it accepted five additional indictments which were motivated by vindictiveness;

D. the trial court erred when it allowed counsel two continuances against Fitz's wishes;

E. the jury was biased due to media coverage;

F. the trial court forced Fitz to choose between his right to effective assistance of counsel and his right to a fair and impartial trial;

G. the trial court erred in appointing Nagy as defense counsel because Nagy had a heavy workload and was not prepared to go forward in a timely manner;

> H. the Commonwealth solicited false testimony;
>
> I. the prosecution presented testimony from inmates in exchange for reduction or dismissal of lengthy sentences;
>
> J. Investigator Spiggle tampered with the gunshot residue taken from the victim; and
>
> K. Fitz was relocated a few times within Rockingham County Jail for unnecessary reasons in order to place him near or in a pod with state agents.

### III. Exhaustion and Procedural Default

"A federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000). To meet the exhaustion requirement, a petitioner "must have presented to the state court both the operative facts and the controlling legal principles." Kasi v. Angelone, 300 F.3d 487, 501-02 (4th Cir. 2002). "A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." Baker, 220 F.3d at 288.

Claims that are procedurally barred under state law are barred from federal habeas review unless the petitioner can demonstrate cause for the default and prejudice from the constitutional error, or a miscarriage of justice. Baker, 220 F.3d at 288; Gray, 518 U.S. at 162. To show cause, a petitioner must demonstrate that there were "objective factors," external to his defense, which impeded him from raising his claim at an earlier stage. Murray v. Carrier, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must establish that the alleged constitutional violation worked to his actual and substantial disadvantage, infecting his entire trial with error of a constitutional magnitude. Id.

Under Martinez v. Ryan, 566 U.S. 1 (2012), a federal habeas petitioner may satisfy the "cause" requirement of an otherwise procedurally defaulted claim of ineffective assistance if: (1) the ineffective assistance claim is a "substantial" one; (2) the "cause" for default "consists of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding." Fowler v. Joyner, 753 F.3d 446, 461 (4th Cir. 2014). A "substantial" claim is one that has merit. Martinez, 566 U.S. at 14.

## IV. Standard of Review

To obtain federal habeas relief, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under 28 U.S.C. § 2254(d), however, a federal court may not grant a writ of habeas corpus based on any claim that a state court decided on the merits unless that adjudication:

> (1) [R]esulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) [R]esulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Where, as here, the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Under this standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded

6

jurists' could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 66, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

## V. Discussion

The respondent asserts that Claims I through III are properly presented for federal review but that Claims IV-VI are procedurally barred.

### 1. Claim I: Juror Impartiality/Bias

In Claim I, Fitz contends that the Court of Appeals of Virginia erred when it denied his claim that the circuit court should have struck two jurors for bias.[4]

"The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, requires that a state provide an impartial jury in all criminal prosecutions." Porter v. Zook, 898 F.3d 408, 425 (4th Cir. 2018). Generally, jurors are presumed to be truthful and impartial. Poynter v. Ratcliff, 874 F.2d 219, 221 (4th Cir. 1989). On federal habeas review, a petitioner may overcome that presumption by clear and convincing evidence of a strong possibility of juror bias. See 28 U.S.C. § 2254(e)(1); Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987).

The bias of a juror may be actual or implied. United States v. Wood, 299 U.S. 123, 133 (1936). Actual bias requires proof that "a juror, because of his or her partiality or bias, was not capable and willing to decide the case solely on the evidence before it." Porter, 898 F.3d at 423. Meanwhile, implied bias is conclusively presumed as a matter of law under exceptional or extreme circumstances. Conaway v. Polk, 453 F.3d 567, 586 (4th Cir. 2006). For example, courts have found implied bias when jurors misled the parties regarding information material to an impartiality determination. See, e.g., United States v. Bynum, 634 F.2d 768, 771 (4th Cir.

---

[4] Under Va. Sup. Ct. R. 3A:14(b), "The court, on its own motion or following a challenge for cause, may excuse a prospective juror if it appears the juror is not qualified, and another shall be drawn or called and placed in the juror's stead for the trial of that case."

7

1980) (ordering new trials when juror in two separate cases did not disclose family members had criminal convictions); Porter, 898 F.3d at 430-31 (concluding that the state court unreasonably applied federal law when the court failed to find bias after a juror neglected to disclose relationships with law enforcement officers); see also McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) ("The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious."). However, a juror's honest but mistaken answer does not mandate that the court order a new trial. See McDonough Power Equipment, Inc., 464 U.S. at 556 (refusing new trial in products liability case when juror honestly but mistakenly answered in the negative to a question about any injury resulting in disability or prolonged pain).

Generally, voir dire examination serves to protect the right to an impartial jury "by exposing possible biases, both known and unknown, on the part of potential jurors." Id. at 554. "Demonstrated biases in the responses to questions on voir dire may result in a juror being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges." Id. "Determining whether a juror is biased or has prejudged a case is difficult," because the Constitution does not mandate a particular test to determine whether a juror has the "appropriate indifference," the juror may have an interest in concealing her own bias, and the juror may be unaware of the bias. Porter, 898 F.3d at 425.

The Fourth Circuit has held:

> To be sure, due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Rather, due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Id. at 426. However, once a juror has indicated bias, a trial judge may not simply accept the

juror's promise to be fair and impartial. Irvin v. Dowd, 366 U.S. 717, 723 (1961).

When a crime receives publicity, the Supreme Court of the United States has explained: "Under the constitutional standard, . . . the relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." Mu'Min v. Virginia, 500 U.S. 415, 430 (1991).

### A. Factual Background

The record establishes the following. First, the juror working at the Department of Corrections stated at voir dire that, even though she had heard comments about the case, she could remain fair and impartial. Trial Tr. 214-15, Jan. 5, 2015, ECF No. 17-8. When the court brought the juror back out for additional questioning, the juror said that she had heard that the defendant "felt disrespected." Trial Tr. 219. She told the parties: "Well, where I work with the Department of Corrections, you know, you hear that a lot, you know, that someone feels disrespected and they sometimes want to take matter into their own hands and that sort of thing." Trial Tr. 219-20. She acknowledged that the "disrespect" comment resulted in her having a negative connotation in her head toward Fitz. Trial Tr. 220. However, she specifically noted: "But at the same time I feel that I could be fair and impartial . . . It's kind of that, you know, there again from where I work, but sometimes, you know, we might feel disrespected but not want to retaliate or whatever." Trial Tr. 220-21. She also told counsel that she thought she could put her initial feeling completely aside. Trial Tr. 222.

Defense counsel argued extensively for striking the juror: "during the course of questioning she admitted that she heard [that Fitz felt disrespected] and she was gesturing toward her midsection like it was a guttural, like a gut feeling about this where it impacted her strongly and it impacted her immediately upon hearing this." Trial Tr. 223. The trial court disagreed:

> I observed her as well and she was obviously struggling to answer why that comment was something that obviously she testified that she heard. And I understand that she works in the Department of Corrections, but she indicated on your cross examination she was able to stop and say wait a second essentially I can be impartial. And I asked her before she was brought out and asked these questions and she was asked afterwards whether she could put aside what she had heard and judge it purely on the instructions, purely on the law presented. And the type of statement that's being attributed again is whether it comes into evidence or not, whether it's proven or not, she's indicated the ability to weigh that, assess it, listen to it and make determinations and follow instructions. Her body language bespeaks the opposite of what you're indicating to me which is her desire to indicate to you that she can be impartial to what someone stated they heard in the paper. For those reasons I deny your motion to strike for cause on [the juror]. And I would note that the opinion to disqualify a juror is an opinion of that fixed character which repels the presumption of innocence in a criminal case and in whose mind the accused stands condemned already and she has not indicated that. She has indicated she can lay aside her views, render a verdict based solely on the law and the evidence in the case. And again her demeanor is quite obvious in that.

Trial Tr. 225-26.

Second, the trial judge and the juror involved with a pending criminal sentencing in the Rockingham County Circuit Court had this exchange during voir dire:

> Juror: And given the, the case is pending sentencing involving my family, we were helped by a lot of folks in Rockingham County. So I didn't recognize them by name, but it's possible that I might recognize them by face once, once the trial starts
>
> Court: Okay. And that's a circumstance in cases where we have this many witnesses. Unfortunately we can't just parade everyone in . . .
>
> Juror: Right.
>
> Court: . . . for you to look. Let me ask you this, based on the officers that may have assisted your family before, are you able to put aside that knowledge of that person and judge their testimony impartially?
>
> Juror: Absolutely.
>
> Court: All right. And the mere fact that they may be a police officer, that doesn't create any issues with you deciding whether their testimony is false or true on an impartial basis, correct?

10

Juror: Not that I'm aware of.

Trial Tr. 80. He also acknowledged the significant impact of the crime on the family, and that he was involved with the victim/witness program at the Commonwealth's Attorney's office. Trial Tr. 91. Nevertheless, he informed defense counsel that he believed that he could put aside any work with the police and the Commonwealth Attorney's office and judge the case impartially based on the evidence. Trial Tr. 86, 91. Later on, the juror stated that he had some potential difficulty with the sentencing phase regarding the death penalty; however, he reasserted that he had no issue regarding guilt or innocence. Trial Tr. 102. Specifically, the juror told the court that he didn't feel that his beliefs about the death penalty "would affect anything about how I would approach a verdict in the case," and, if the death penalty was not part of the case, his "concerns would be alleviated." Trial Tr. 112-13.

Counsel argued the juror be struck for cause:

> The appearance of impartiality when we have a person who has got a very highly emotionally charged case sitting in judgment of a very highly emotionalized case. There is apparently a child involved in that case. There is a child involved in this case. Not necessarily as a victim. I think he said enough things that led me to believe he's not going to be able to sit in this case impartially.

Trial Tr. 118. The court disagreed:

> I've had the opportunity to observe Mr. Hall. He's very open about his answers, wasn't hesitant to bring up issues when he felt so. Just like [other jurors]. And he indicated that he could be fair and impartial. The only thing that eventually got close to it was whether there was going to be the issue of the death penalty, which of course he will not be instructed, the death penalty isn't on the table in the case, and so that concern is not one. He said he can follow instructions that we're going to give him. And he was very clear about his ability to be impartial in the case. And again his demeanor just bespoke of genuineness in the way he responded.

Trial Tr. 119.

On direct appeal, the Court of Appeals of Virginia concluded:

11

> During voir dire, one of the potential jurors indicated that she had heard a person discuss the case after having read a newspaper article. The person stated that appellant had "said that he had felt disrespected." The juror explained she worked at the Department of Corrections and that she often heard people complaining about having felt disrespected. The juror acknowledged the statement gave her a "negative impression" of appellant but also emphasized that she "could be fair and impartial." She indicated she could put aside what she heard, consider the evidence presented at trial, and follow the instructions of the court. The trial court denied appellant's request to strike the juror for cause.
>
> Another juror informed the court that a family member was the victim in an indecent liberties case in which sentencing was still pending in Rockingham County. The juror stated that he could remain fair and "absolutely" judge the witnesses' testimony impartially. He also confirmed he could follow the instructions of the court. The trial court found that the juror's "demeanor just bespoke of genuineness in the way he responded" and denied appellant's request to strike the juror for cause.
>
> Both prospective jurors indicated they could render a verdict based solely on the law and the evidence in the case. They adequately demonstrated they could fairly review the evidence and make an impartial decision. Accordingly, we find no error in the trial court's refusal to strike the prospective jurors for cause. The trial court observed the jurors, evaluated their responses, and determined that they could fairly try the issues presented. Based on our examination of the record, we find that this determination was not plainly wrong.

Fitz v. Commonwealth, No. 0770-15-3, slip op. at 2-3.

### B. Fitz's Allegations

Fitz asserts that (1) the juror employed by the Department of Corrections was biased because of her "negative impression" of Fitz regarding the "disrespected statement," (2) the juror involved in a pending sentencing in the Rockingham County Circuit Court had a conflict of interest, and (3) the media sensationalized Fitz's trial.[5]

### C. Analysis

Fitz fails to show that there was such a strong possibility of juror bias that the decision of the Court of Appeals of Virginia should be overturned. At the threshold, Fitz has not

---

[5] Fitz also avers that the prosecutor exacerbated the jurors' bias by: overreaching, using false testimony, mischaracterizing evidence, and introducing extremely irrelevant prejudicial information. However, he fails to note any specific action by the prosecution that resulted in juror bias. Therefore, the court will not address the additional allegations. See Nickerson v. Lee, 971 F.2d 1125, 1135 (4th Cir. 1992) abrogated on other grounds by Gray v. Netherland, 518 U.S. 152, 165-66 (1996) (habeas petitioner must present evidence supporting his claims).

12

demonstrated implied bias by clear and convincing evidence. Plaintiff's allegations and the record do not indicate an exceptional situation where the jurors misled the parties or had a personal connection to the case—he has not alleged that the jurors withheld material information, were dishonest, or had relationships with parties or witnesses, or that other circumstances established juror bias as a matter of law. Second, Fitz has not shown that the jurors were actually biased. Both jurors stated that they could adequately review the evidence and impartially decide Fitz's guilt. As to the juror employed by the Department of Corrections, despite "disrespect" having an immediate negative connotation in her mind, she acknowledged that people often feel disrespected and do not react in criminal ways. She also asserted that she would judge the case impartially based on the evidence presented. For the juror involved in a separate criminal proceeding, he stated that he could remain fair and "absolutely" judge the case impartially. Furthermore, Fitz's case is not overly similar or related to the sentencing that the juror was involved in—Fitz murdered an adult in front of children; the juror's case involved a sexual crime against a minor victim.[6] Lastly, although the juror mentioned difficulty with the death penalty, the issue was irrelevant because the death penalty was not a possibility in Fitz's case.

As for the third allegation regarding overall media sensationalism, Fitz fails to demonstrate that the media coverage caused the jurors to have "such fixed opinions that they could not judge impartially the guilt of the defendant." Mu'Min, 500 U.S. at 430. Some jurors fully admitted to hearing or reading about Fitz's crime. However, their exposure was relatively limited, and the Supreme Court does not require jurors to be completely unaware of the facts of a case. Murphy v. Florida, 421 U.S. 794, 800-01 (1975) ("Qualified jurors need not, however, be totally ignorant of the facts and issues involved."). Furthermore, the parties and the court

---

[6] The juror also told the court that, although he would be present at the sentencing hearing, he did not plan on being directly involved or testifying.

repeatedly questioned jurors on whether they could put aside any prior, external knowledge and render a fair and impartial verdict based on the evidence presented in the trial. The jurors stated that they could do so. Fitz has also not asserted any specific evidence showing that the jurors had unconstitutionally fixed opinions, which is fatal to his claim. See Nickerson, 971 F.2d at 1135.

Therefore, Fitz has not demonstrated by clear and convincing evidence that the Court of Appeals of Virginia's decision was contrary to, or an unreasonable interpretation of, federal law, or an unreasonable determination of the facts. The court will grant the motion to dismiss as to Claim I.

### 2. Claim II: Conflict of Interest

In Claim II, Fitz avers that the Court of Appeals of Virginia erred when it affirmed the trial court's decision to remove Graves as counsel due to a conflict of interest. Fitz argues that appointing co-counsel could have cured any potential conflict because the simultaneous representation only existed for three days, and Graves had the representation of the potential witness "thrust upon" him. The Court of Appeals of Virginia found that the trial court did not abuse its discretion when it rejected Fitz's waiver of the conflict and removed Graves:

> When the Commonwealth learned that appellant's original counsel, Aaron Graves, was simultaneously representing an informant the Commonwealth planned to call as a witness against appellant, the Commonwealth filed a motion to determine if a conflict existed. After hearing argument of counsel, the trial court concluded the conflict could only be resolved by relieving appellant's counsel and appointing new counsel.
>> [T]rial courts must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses. This standard gives trial courts broad latitude because the likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with

14

> criminal trials. It necessarily follows that the trial court has a unique obligation to foresee problems over representation that might arise at trial and head them off beforehand.
>
> Appellate courts may rely heavily on a trial court's instinct and judgment based on experience in making its decision. It should be no surprise, then, that different trial courts faced with the similar circumstances would reach opposite conclusions with equal justification, but that does not mean that one conclusion was "right" and the other "wrong." The evaluation of the facts and circumstances of each case under this standard, therefore, must be left primarily to the informed judgment of the trial court. When reasonable jurists could disagree, the trial court's ruling should stand on appeal.
>
> Johnson v. Commonwealth, 50 Va. App. 600, 605-06, 652 S.E.2d 156, 158-59 (2007) (emphasis in original).
>
> In this case, the trial court permissibly rejected appellant's waiver of the conflict of interest and relieved his counsel. The trial court did not abuse its discretion in disqualifying Graves.

Fitz v. Commonwealth, No. 0770-15-3, slip op. at 3. The court agrees with the state court's decision.

In denying Fitz's appeal, the Court of Appeals of Virginia closely tracked the standard that the Supreme Court of the United States has set out for attorney conflicts of interest. See Wheat v. United States, 486 U.S. 153, 163 (1988) ("[T]he district court must be allowed substantial latitude in refusing waivers of conflicts of interest."). Also, the Fourth Circuit has previously ruled that the district court has "sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal either on right-to-counsel grounds if it disqualifies the defendant's chosen lawyer, or on ineffective-assistance grounds if it permits conflict-infected representation of the defendant." United States v. Williams, 81 F.3d 1321, 1324 (4th Cir. 1996).

As to Fitz's first allegation, even though the simultaneous representation was limited, the potential conflict of interest was serious because the represented witness was adverse to Fitz. See id. at 1324-25 (affirming disqualification of defendant's attorney because he would have been required to cross-examine a former client). Therefore, the circuit court was well within its

15

significant discretion when it disqualified Graves.

Second, Fitz asserts that the conflict at issue falls within a narrow exception to the "hot potato" rule known as the "thrust upon" doctrine. The hot potato rule "is based on the notion that a lawyer should not be allowed to profit from a conflict of his own making." Flying J Inc. v. TA Operating Corp., No. 1:06CV30TC, 2008 WL 648545, at * 4 (D. Utah March 10, 2008); see also Picker v. Int'l, Inc. v. Varian Assocs., Inc., 670 F. Supp. 1363, 1365 (N.D. Ohio 1987) ("A firm may not drop a client like a hot potato, especially if it is in order to keep happy a far more lucrative client."); Altova GmbH v. Syncro Soft SRL, 320 F. Supp. 3d 314, 318 (D. Ma. July 26, 2018) ("Some courts have adopted the judicially created hot potato doctrine in their conflict of interest analysis by holding that lawyers should, as a general matter, remain loyal to their current client and decline to take on a new, conflicting representation.").

Meanwhile, several courts have "generally held that, when a conflict arises which the challenged law firm played no role in creating, counsel may avoid being disqualified from representing both of its clients by moving swiftly to sever its ties with one of them, in such a way as to minimize prejudice to the other." Flying J Inc., 2008 WL 648545, at *4.[7] Model Rule 1.7 states the following regarding such conflicts:

> Unforeseeable developments, such as changes in corporate and other organizational affiliations or the addition or realignment of parties in litigation, might create conflicts in the midst of a representation, as when a company sued by the lawyer on behalf of one client is bought by another client represented by the lawyer in an unrelated matter. Depending on the circumstances, the lawyer may have the option to withdraw from one of the representations in order to avoid the conflict. The lawyer must seek court approval where necessary and take steps to minimize harm to the clients. The lawyer must continue to protect the confidences of the client from whose representation the lawyer has withdrawn.

---

[7] An example of a thrust upon conflict would be: a law firm represents Company A and Company B. Company A sues Company C. Sometime after litigation begins, Company C purchases Company B. The law firm simultaneously represents Company A and a subsidiary of Company C, who have become adversaries because of a transaction by the opposing party. The conflict occurred by no fault of the law firm, thus implicating the "thrust upon" doctrine.

16

Model Rules Prof'l Conduct 1.7 cmt. 5.

The court cannot find any example of the hot potato doctrine applying in a criminal context. Courts originally created the hot potato doctrine for conflicts arising out of corporate restructuring, and the standard for attorney conflicts of interest is different for a civil case than for a criminal case. See Ramos v. Cowan Systems, LLC, No. 13-3639, 2015 WL 8664279, at *3 (D.N.J. Dec. 11, 2015) ("A witness called by the prosecution to testify against a criminal defendant may indeed place counsel in a conflict position if he represents both the defendant and the adverse witness. The same reasoning does not, however, apply in a civil case."). In criminal trials, courts generally do not have to worry about a lawyer withdrawing from a client in order to maintain representation of a higher paying client. Thus, the court concludes that the hot potato doctrine does not apply to Graves' disqualification. Regardless, the state court's decision was not unreasonable or contrary to federal law because no clearly established federal law requires state courts to analyze the thrust upon exception in criminal cases.

Therefore, because of the seriousness of Graves's potential conflict, the significant discretion afforded the trial court in conflict determinations, and the unavailability of the hot potato doctrine in the criminal context, the court concludes that Fitz has failed to demonstrate that the state court's decision to disqualify Graves was contrary to, or an unreasonable application of, federal law, or an unreasonable determination of the facts. The court will grant the motion to dismiss as to Claim II.

### 3. Claim III: Sufficiency of the Evidence

In Claim III, Fitz asserts that the Court of Appeals of Virginia erred when it found the evidence sufficient to support his convictions for second-degree murder and use of a firearm in

commission of a murder. Fitz alleges that he acted in self-defense because he panicked after Turner threatened him.

Federal habeas review of a claim challenging the constitutional sufficiency of the evidence supporting a conviction is limited to determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). In determining whether the state court reasonably applied this principle, the federal habeas court must determine whether the state court's decision is minimally consistent with the record, Bell v. Jarvis, 236 F.3d 149, 159 (4th Cir. 2000), and must give deference to the findings of fact made by both the trial and appellate courts, 28 U.S.C. § 2254(d); Howard v. Moore, 131 F.3d 399, 406 (4th Cir. 1997). The federal court does not weigh the evidence or consider the credibility of witnesses. United States v. Arrington, 719 F.2d 701, 704 (4th Cir. 1983).

On direct review, the Court of Appeals of Virginia held:

> In this case, the jury accepted the testimony of the Commonwealth's witnesses and rejected Fitz's version of the events. . . . The record supports the jury's credibility determination and demonstrated that appellant initiated the confrontation and shot the victim without justification. The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that Fitz was guilty of second-degree murder and use of a firearm during the commission of a felony.

Fitz v. Commonwealth, No. 0770-15-3, slip op. at 5. The court agrees with the state court's decision. The Commonwealth presented compelling testimony from, among others, Williams, three neighbors, Haughton, Chacon, and Taylor, that Fitz shot and killed an unarmed Turner without justification, and the jury credited those witnesses' statements in finding Fitz guilty of second-degree murder and use of a firearm during the commission of a felony. After viewing the evidence in the light most favorable to the prosecution, the court finds that a rational trier of fact

18

could have found the essential elements of the crimes beyond a reasonable doubt, and the state court's decision is consistent with the record. Therefore, the court concludes that the state court's adjudication was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. The court will grant the motion to dismiss as to Claim III.

### 4. Claims IV-VI: Exhaustion and Procedural Default

First, Fitz presented Claim IV to the Supreme Court of Virginia, but the court upheld the lower court's ruling that the claim was procedurally defaulted under Virginia's contemporary objection rule, Va. Sup. Ct. R. 5A:18. See Fitz v. Commonwealth, No. 0770-15-3 (Va. Ct. App. Feb. 9, 2016), ECF No. 17-2; Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (establishing "look-through" doctrine for summary decisions). Va. Sup. Ct. R. 5A:18 is an independent and adequate state ground for procedural default. See Weeks v. Angelone, 176 F.3d 249, 270 (4th Cir. 1999) (Virginia contemporaneous objection rule, Va. Sup. Ct. R. 5:25, is independent and adequate state ground); Gutersloh v. Watson, No. 7:10CV00083, 2010 WL 3664507, at *3-4 (W.D. Va. Sept. 17, 2010) (Va. Sup. Ct. R. 5A:18 is an independent and adequate state ground). Therefore, Claim IV is procedurally bared from habeas review.

Second, Fitz never presented Claims V and VI to the Supreme Court of Virginia. Fitz cannot now return to state court to properly exhaust his claims because his direct appeal is final and the statute of limitations would bar any habeas petition in the state court. See Va. Code § 8.01-654(A)(2). Therefore, Claims V and VI are simultaneously exhausted and defaulted under Baker. See Baker, 220 F.3d at 288.

Lastly, Fitz fails to excuse his defaults because he has not demonstrated cause and prejudice or a miscarriage of justice. First, Fitz has not shown that objective factors, external to

his defense, prevented him from properly raising the claims, or that the alleged constitutional errors infected his entire trial. Second, Fitz does not raise an actual innocence argument.[8] Third, Martinez does not apply because Fitz did not file a state habeas petition. See Fowler v. Joyner, 753 F.3d at 461 (excusing ineffective or no counsel at initial state collateral proceeding). Therefore, Claims IV through VI are procedurally defaulted, and the court will grant the motion to dismiss as to these claims.

## VI. Conclusion

For the reasons stated, the court will grant the motion to dismiss. The petition is partially defaulted and otherwise without merit. An appropriate order will enter this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to Fitz and to counsel of record for Respondent.

ENTER: This 31st day of October, 2018.

Senior United States District Judge

---

[8] Fitz does not argue a colorable claim of actual innocence under Schlup v. Delo, 513 U.S. 298 (1995), that would allow for review of his claims regardless of default. Therefore, the court will not address the miscarriage of justice exception. See Burket v. Angelone, 208 F.3d 172, 183 n.10 (4th Cir. 2000) (reasoning that because petitioner bears burden to raise actual innocence, a court need not consider it if not asserted by petitioner).